IN THE UNITED STATES BANKRUPTCY COURT
DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| In re:<br><br>Barnwell County Hospital,<br><br>        Debtor. | Case No.<br>Chapter 9 |

## DEBTORS' MOTION FOR ORDER DETERMINING THAT PATIENT CARE OMBUDSMAN UNDER SECTION 333(a)(1) OF THE BANKRUPTCY CODE IS NOT NECESSARY AND MEMORANDUM OF LAW IN SUPPORT

Barnwell County Hospital (the "Debtor") hereby moves for entry of an Order finding the appointment of a patient care ombudsman pursuant to 11 U.S.C. § 333(a)(1) is not necessary for the protection of patients in this case. In support of this Motion, the Debtor incorporates by reference its Memorandum in Support of its Statement of Qualifications Under 11 U.S.C. § 109(c) filed on even date herewith, and the Debtor would respectfully show unto this Court the following:

1. The Debtor has filed a petition seeking relief under chapter 9 of the United States Bankruptcy Code ("Bankruptcy Code"). The Debtor, a public agency, 1953 by act of the South Carolina Legislature to provide hospital facilities to the residents of Barnwell County (the "County").

2. The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§157 and 1334. Venue of this case is proper in this Court pursuant to 28 U.S.C. § 1408.

3. Debtor operates as a hospital located in the city of Barnwell, SC on 811 Reynolds Road, Barnwell, South Carolina. Debtor is licensed for 53 beds but currently operates 31 beds with both private and semi-private rooms. The Debtor has 2 general surgical suites and an

1

Endoscopy room with three recovery bays. The Hospital's imaging department offers 2 radiographic rooms and a portable x-ray machine, ultrasound, mammography, 16 slice CT scanner, mobile MRI services on a weekly basis, and a C-arm for surgical and endoscopic procedures. The Debtor also operates a Critical Care Unit with 3 ICU beds and 4 step-down beds, a sleep center with 2 beds, Cardiovascular Services, Behavioral Health, and Rehabilitation Services. The hospital's ER is a 7 bed unit.

The Debtor also owns and operates three provider-based Rural Health Clinics in the southwestern rural area of South Carolina serving the communities of Blackville, Williston, and Wagener. These Rural Health Clinics provide primary health services, basic lab services, emergency care services, after hours coverage and makes arrangements for patient hospital specialty care.

.       The Debtor provides general medical and surgical care in inpatient, outpatient, and emergency room service areas. The Debtor has 14 physicians on active medical staff and 13 are Board Certified.

4.      The Debtor has been operating at a loss. The net revenue for year-to-date ending July 31, 2011 was $11,795,845. This was $769,750 less than Debtor budgeted. Year-to-date ending July 31, 2011, Debtor has operated at a loss of $1,020,160.

5.      The Debtor has been able to stay in business only because the County has provided funding to the Debtor. The Debtor has been informed by the County that the County does not have the ability or intent to continue funding the operating losses of the Debtor in the future. Even with the County providing supplemental funding, the Debtor has struggled to pay its debts in the ordinary course of business.

6.      Pursuant to section 333(a)(1) of the Bankruptcy Code, a patient care ombudsman

need not be appointed if the court finds that an ombudsman is not necessary for protection of the patients under the specific facts of a case. As set forth in detail below, there are processes and mechanisms in place by which the Debtor monitors and improves the quality of care it provides to patients and protects patient privacy. These mechanisms provide the necessary protection for patients and therefore a court appointed patient care ombudsman is not necessary and would serve only to subject the Debtor to unnecessary expense.

## I. PATIENT PROTECTION

The Debtor believes that its pre-existing system for monitoring patient care and safety is effective and provides the necessary protection for patients which is beyond what an appointed patient care ombudsman could provide.

a. <u>State and Regulatory Oversight of Debtor</u>.

The Debtor is reviewed annually by the South Carolina Department of Health and Environmental Control ("DHEC") and Centers for Medicare and Medicaid Services ("CMS").[1] The Debtor is in full compliance with the patient care and safety standards established by CMS and DHEC. Additionally, the Debtor maintains the appropriate and necessary licenses to operate in the State of South Carolina, which license is renewed annually, and granted based on surveys, patient complaints, ability to meet emergency preparedness and life safety requirements. The Debtor is subject to inspections by DHEC for licensing and certification purposes, to monitor compliance with regulations, and to follow up on patient complaints. DHEC last surveyed the Debtor in May 2011. If the Debtor failed a DHEC inspection or failed to correct an issue of non-compliance with federal or state regulations, the Debtor could lose its license to operate as a hospital.

---

[1] CMS's mission is to ensure effective health care coverage and promote quality care for beneficiaries of Medicare and Medicaid.

Licensed personnel of the Debtor, including physicians, nurses, therapists, pharmacists and technicians are regulated by their individual state boards, including the South Carolina State Board of Medicine, South Carolina State Board of Nursing, and the South Carolina State Board of Pharmacy.

The Debtor is also accredited by the Joint Commission Accreditation for Hospitals and Laboratories. Hospitals and Laboratories participating in The Joint Commission's accreditation process receive expert assistance and support from individual account executives and standards implementation and patient safety experts. Joint Commission certified surveyors provide a rigorous evaluation of the hospital's patient care processes and helpful expert advice on how to improve. Accreditation means that the Debtor has voluntarily undergone a challenging, comprehensive evaluation to review and improve the key factors that can affect the quality and safety of its patients. Accreditation by The Joint Commission is considered the gold standard in health care. The Joint Commission commands best practices throughout the organization and every 24-36 months the Debtor is re-surveyed by the Joint Commission to determine the commitment and success with best practices in hospital setting.

The Debtor must also follow Occupational Safety and Health Administration ("OSHA") guidelines.

b.    <u>Internal Operating Guidelines</u>.

The Debtor has implemented a Performance Improvement Plan that is revised and updated annually. The Debtor has an Performance Improvement Committee which was developed to review and revise and implement quality practices into the hospital. Committee membership is made up of department managers and meets monthly. The team collects data to measure quality all over the hospital setting. Some of the areas included are: hand washing, use

4

of unapproved abbreviations; code blues; appropriate use of restraints; response to critical values; safety rounds; return visits within 72 hours, patient call backs, patient satisfaction surveys; monitoring of equipment and quality, controls; cleaning program for nondisposable equipment; medication errors, medication recalls, incident reporting, and accuracy of chart documentation.

Policies that ensure quality health services are reviewed and revised at a minimum of every 2 years and some of the safety policies are reviewed and revised annually. Data that is collected is reported to: the Administrative Team, Performance Improvement Committee, Environment of Care Safety Committee, Medical Staff Executive Committee, and the Board. Data is also reported to CMS related to Standards of Care for Core Measures. Patient Satisfaction is reported to external data base called HCAPS that uses this data to compare the Debtor to other hospitals. Length of Stays and mortality rates are also reported and used in national comparative data bases.

The Debtor informs, in writing, each patient as the time of admission of the patient's rights. Each patient receives The Patient's Bill of Rights and Louis Blackman Act from the admissions clerk.

Patients are asked to sign an informed consent at the registration of each visit. They have any questions answered at this time. Each time a patient has an invasive procedure done (for example, an endoscopy, blood transfusion, surgical procedure, biopsy, etc.), a separate informed consent is signed after the physician has provided the patient a clear explanation of the testing or procedure as well as the risks and benefits of the procedure.

The Debtor takes patient complaints and/or concerns very seriously. All staff members know the policy regarding patient complaints and can direct patients or customers where they

5

need to be so that their concerns can be addressed. Normally, the complaint goes to the department manager where concern originates. If for some reason, that person is unavailable, or the complaint is about them, the complaint is referred to the Compliance Officer. The complaint form is filled out and an investigation begins to determine exactly what has occurred. If the concern/complaint is related to a HIPPA concern, this is referred to the HIPPA officer for investigation. The hospital also has a vendor called "Global Compliance" which is a 24 hour a day hotline that employees or customers may call at any time to remain anonymous. These calls are screened by trained compliance officers and forwarded to the compliance officer's confidential voice mail or email. At the close of an investigation, all efforts to resolve issues with customer is taken. If the concern requires bill modification, this has to be authorized in writing by the CEO. If a physician or nurse is involved, they are made aware of the complaint and required to respond in writing on the complaint form. Complaints are reported to the Medical staff and to the Board in a quarterly report by Risk Manager (Compliance officer). All complaints are filed and maintained for 10 years in a locked file in the Compliance officer's space. Complaints over 10 years old are shredded.

    c.    <u>Patient Ratios</u>

The average length of impatient stay for is 2.2 to 2.9 days. The average length of stay for observation is 1.3 to 1.7 days. Visiting hours for the hospital is 9:00 am to 9:00 pm. Children under 12 are not allowed to visit unless special permission from the patient's physician or nursing supervisor is given. The hospital, nursing and physician staff is very accommodating for family who wishes to remain with patient throughout hospitalization, providing cots and meals where needed. The hospital does require an adult to remain at all times with pediatric patients under six years of age.

6

The staffing ratios for each patient is based upon the patient's needs. Staffing assignments are made according to the following specific guidelines.

Medical Surgical Acute Care:

Day & Night Shift has 2 Nurses, 1 Certified Registered Nurse Anesthetist, 1 Monitor Tech for 7-15 patients. If census less than 7, only one nurse and one monitor, tech per shift. House Supervisor 7PA seven days/week; House Supervisor 7AP Weekend days.

Emergency Department:

Average Daily Census is 28-32 patients. Day shift has two nurses, one monitor tech; 10 am- 10 pm: one nurse and one tech; Evening shift is two nurses and one monitor tech

Endoscopy:

Average day of planned scopes 12-16 (Includes Pre, Pen and Post Procedure). 4 Registered Nurses; 2 Surgical Techs; 1 Certified Registered Nurse Anesthetist.

Operating Room:

2 Registered Nurses; 2 Surgical Techs; 1 Certified Registered Nurse Anesthetist.

    d.    Presence of Safeguards to Ensure Appropriate Care.

Currently, Mary Valliant is the Chief Executive Officer ("CEO") of Debtor who supervises and directs the general management and operations of the Debtor and oversees the delivery of patient services. Ms. Valliant has worked for the Debtor since 2006. From July of 2006 until January of 2009, she was the Chief Nursing Officer for Debtor. In January 2009, Ms. Valliant became the CEO and was in that role until May 2011. At that time, Debtor retatined Healthcare Management Partners, LLC ("HMP") to manage the Debtor, and Michael Morgan from HMP became the CEO. During the time HMP was managing the Debtor, Ms. Valliant was

7

in the Patient Care Services position. In September, 2011, HMP's contract with the Debtor was terminated, and Ms. Valliant was instituted as the Interim CEO.

Ms. Valliant graduated in 1968 from Crouse Irving School of Nursing as a Registered Nurse in Syracuse, New York. She received her BSN from State University of New York and Masters of Science from Syracuse University. She has worked as a Nurse Manager of ICU/CCU, Director of ICU, CCU, OB, PP, NBN, ED and endoscopy. She has previously been employed as the Vice President of Nursing at Community General Hospital, in Syracuse New York and was over the specialty areas and Women's programs. She then became a Senior Vice President for new Program Development at Community General. Upon moving to South Carolina, she became employed by Debtor. She has worked in Healthcare for 43 years.

## II. ARGUMENT

If the debtor in a case under chapter 9 is a health care business, the appointment of a patient care ombudsman is mandated by § 333(a)(1), not later than 30 days after commencement of the case, to monitor the quality of patient care and to represent the interests of the debtor's patients "unless the court finds that appointment of such ombudsman is not necessary for the protection of patients under the specific facts of the case." An ombudsman appointed under § 333(a)(1) monitors the quality of patient care provided to patients of the debtor and reports to the court regarding the quality of patient care provided to patients of the debtor. 11 U.S.C. § 333(b).

It is clear the Debtor is a "health care business" under § 107(27)(A), as it is a public agency engaged in offering health care services through its hospital facilities to the residents of the County, and therefore §333(a)(1) is applicable to the Debtor.

A. **A Patient Care Ombudsman is Not Necessary.**

In determining whether a patient care ombudsman is necessary under the specific facts of a case, courts have examined the following nine non-exclusive factors: 1) the cause of the bankruptcy; 2) presence and role of licensing or supervising entities; 3) debtors past history of patient care; 4) the ability of the patients to protect their rights; 5) level of dependency of the patients on the facility; 6) likelihood of tension between the interests of the patients and the debtor; 7) potential injury to the patients if the debtor drastically reduced its level of patient care; 8) presence and sufficiency of internal safeguards to ensure appropriate level of care; and 9) impact of the cost of an ombudsman on the likelihood of a successful reorganization. *In re Valley Health Sys,* 381 B.R. 756 (Bankr. C.D. Cal. 2008); *In re Alternate Family Care,* 377 B.R. 754, 758 (Bankr. S.D. Fla. 2007). "Other factors to be considered by the court include: (1) the high quality of the debtor's existing patient care; (2) the debtor's financial ability to maintain high quality patient care; (3) the existence of an internal ombudsman program to protect the rights of patients, and/or (4) the level of monitoring and oversight by federal, state, local, or professional association programs which renders the services of an ombudsman redundant." *Valley Health,* 381 B.R. at 761 (citing 3 *Collier on Bankruptcy P 333.02,* at 333-4 (Alan N. Resnick & Henry J. Sommer eds., 15th ed. 2007)).

Since the enactment of section 333, bankruptcy courts have exercised their discretion and held the appointment of an ombudsman unnecessary. *See In re RAD/ONE, P.A.,* 2009 Bankr. LEXIS 417 (Bankr. N.D. Miss. Feb. 24, 2009)[2] (court declined to appoint patient care ombudsman where debtor had an existing internal ombudsman program and was compliant with regulatory agency requirements); *In re Valley Health Sys.,* 381 B.R. 756 (Bankr. C.D. Cal. 2008) (court declined to appoint patient care ombudsman where health care district had no history of

---

[2] Copies of unpublished cases cited herein are attached hereto as Exhibit 1.

9

patient care problems and adequate internal monitoring systems); *In re Saber, M.D.*, 369 B.R. 631 (Bankr. D. Colo. 2007) (court declined to appoint patient care ombudsman where debtor was a single physician entity, with 20 years of experience, in good standing with a positive cash flow who filed bankruptcy for reasons unrelated to patient care); *In re Medical Assocs. of Pinellas*, 360 B.R. 356, 361 (Bankr. M.D. Fla. 2007) (court declined to appoint patient care ombudsman where debtor had ceased operation); *In re Total Woman Healthcare Center, P.C.*, 2006 Bankr. LEXIS 3411 (Bankr. M.D. Ga. Dec. 14, 2006) (court declined to appoint patient care ombudsman where patient care had not been affected by bankruptcy and debtor's obligations not related to patient care).

Considering the factors under the specific facts and circumstances in this case, the balance weighs against the appointment of a patient care ombudsman pursuant to § 333(a)(1).

**Factor 1: Cause of Bankruptcy**: Debtor is seeking relief under chapter 9 due to a shortfall of revenue to pay its debts, not because there are any allegations of deficiency patient care.

**Factor 2: Presence of Licensing/Supervising Entities**: The Debtor is subject to substantial monitoring by a variety of federal and state regulatory agencies as described above. Additionally, Debtor is accredited by the Joint Commission which includes additional monitoring. Finally, Debtor is compliance with all applicable federal and state regulations.

**Factors 3 and 8: Debtor's Past History of Patient Care/Internal Safeguards**: The Debtor has served the residents of the County since 1952. The Debtor has adopted internal procedures to ensure the highest level of patient care and to resolve expeditiously complaints that may arise concerning patient care. Furthermore, there is no evidence of action taken by any federal or state regulatory authority against the Debtor due to patient care issues.

**Factors 4 and 6: Ability of the Patients to Protect Their Rights; The Likelihood of Tension Between the Interests of the Patients and the Debtor:** The Debtor has implemented internal quality controls and procedures for monitoring patient care at the hospital. There are procedures in place for handling and resolving any complaints made by patients. The patient are informed, in writing, of their rights upon being admitted to the hospital.

**Factor 5: Level of Dependency of Patients on the Facility.** The Debtor provides general medical and surgical care in inpatient, outpatient, and emergency room service areas at the hospital. The patients under the Debtor's care are dependent on the Debtor for their health, safety and welfare when at the hospital, however, the average length of inpatient stay is 2.2 to 2.9 days.

**Factor 7: Potential Injury to Patients if the Debtor Drastically Reduced its Level of Patient Care.** The Debtor is meeting and/or exceeding national staffing ratios. The Debtor is working to ensure that patient care is provided in an appropriate and planned manner consistent with patient's rights and needs.

**Factor 9: Impact of the Cost of an Ombudsman on the Likelihood of a Successful Reorganization.** For the reasons discussed above, the Debtor does not believe a patient ombudsman is necessary in this case to protect the interest of the patient and would unnecessarily duplicate services already being provided to the Debtor. The appointment of a patient care ombudsman may result in substantial administrative expense to the Debtor's estate, which payments would delay or impair the claims of Debtor's unsecured creditors. Given the level of internal controls and oversight by federal and state agencies and the current management of the Debtor, the services of a patient care ombudsman would be redundant and "would merely

add another layer of bureaucracy to an already heavily regulated and supervised" entity. *See Alternate Family Care*, 377 B.R. at 761.

Weighing the above factors under the specific facts and circumstances in this case, the balance weighs against the appointment of a patient care ombudsman pursuant to § 333(a)(1). Currently, there are processes and mechanisms in place by which the Debtor monitors and improves the quality of care it provides to patients and protects patient privacy. These mechanisms provide the necessary protection for patients, and therefore a court appointed patient care ombudsman is not necessary and would serve only to subject the Debtor to unnecessary expense.

### III.    CONCLUSION

For all the foregoing reasons, the Debtor respectfully requests that the Court issue its order determining that the appointment of a patient care ombudsman in this case is not necessary.

**HAYNSWORTH SINKLER BOYD, P.A.**

By:    /s/ Stanley H. McGuffin
      District ID No. 2833
      Lindsey Carlberg Livingston
      District ID No. 9518

Post Office Drawer 11889
Columbia, South Carolina 29211
(803) 779.3080 Tel
(803) 765.1243 Fax
bshortl@hsblawfirm.com
llivingston@hsblawfirm.com

October 5, 2011                        Attorneys for Debtor



IN RE: RAD/ONE, P.A., d/b/a DELTA DIAGNOSTICS, DEBTOR.

CASE NO. 08-15517-NPO, CHAPTER 11

UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF MISSISSIPPI

2009 Bankr. LEXIS 417; Bankr. L. Rep. (CCH) P81,431

February 24, 2009, Decided

**COUNSEL:** [*1] For RAD/ONE, P.A., dba Delta Diagnostics, Debtor: Jeffrey A. Levingston, Levingston & Levingston, PA, Cleveland, MS; Paul M. Ellis, Butler, Snow, O'Mara, Stevens & Cannada, Jackson, MS.

For U. S. Trustee, U.S. Trustee: Christopher James Steiskal, Jackson, MS.

**JUDGES:** NEIL P. OLACK, U.S. BANKRUPTCY JUDGE.

**OPINION BY:** NEIL P. OLACK

**OPINION**

**MEMORANDUM OPINION AND ORDER GRANTING MOTION TO DISPENSE WITH APPOINTMENT OF PATIENT CARE OMBUDSMAN**

On February 4, 2009, there came on for hearing (the "Hearing") the Order Directing Appointment of Patient Care Ombudsman (Dk. No. 6) (the "Order") issued by the Court; the Motion to Dispense with Appointment of Patient Care Ombudsman (Dk. No. 22) (the "Motion") filed by RAD/ONE, P.A. (the "Debtor"); and, the United States Trustee's Response to Motion to Dispense with Appointment of a Patient Care Ombudsman (Dk. No. 23) (the "UST's Response") filed by R. Michael Bolen, the United States Trustee for Region 5 (the "UST") in the above-styled chapter 11 proceeding. Jeffrey A. Levingston represented the Debtor, and Christopher James Steiskal represented the UST. The Court, being fully advised in the premises and having considered the pleadings, evidence, authorities, and arguments presented [*2] by counsel, finds as follows: [1]

1. The Debtor initiated this voluntary chapter 11 case by the filing of a petition (Dk. No. 1) (the "Petition") on December 23, 2008.

2. On the Petition, the Debtor indicated that the nature of its business is "Health Care Business."

3. On December 24, 2008, this Court entered the Order and directed the UST to appoint a disinterested person to serve as a patient care ombudsman [2] ("PCO") pursuant to *11 U.S.C. § 333* [3] unless a motion to dispense with the appointment was filed as provided in *Federal Rules of Bankruptcy Procedure 1021(b)* and *2007.2(a)*.

4. On January 22, 2009, the Debtor filed its Motion. On that same date, the UST filed the UST's Response.

5. At the Hearing on the Motion and the UST's Response, the Debtor took the position that a patient care ombudsman is not necessary "for the protection of patients" under the specific facts of this case. The UST asserted that the Debtor's contentions, on their own, were insufficient evidence to prove that a PCO is not necessary and that a hearing was required wherein the Debtor had "the burden to provide testamentary and documentary evidence to the Court regarding, but not limited to, the current level of patient [*3] care and whether the Debtor is in

Exhibit 7

2009 Bankr. LEXIS 417, *; Bankr. L. Rep. (CCH) P81,431

Page 2

compliance with all state and federal regulatory requirements for patient care."

6. The question before the Court, then, is whether a PCO should be appointed for this health care business. The Court has considered a number of factors in determining whether a patient care ombudsman is needed. According to Collier on Bankruptcy, "[f]acts that warrant a decision not to appoint an ombudsman could include that the facility's patient care is of high quality, that the debtor has adequate financial strength to maintain high-quality patient care, that the facility already has an internal ombudsman program in operation or that the situation at the facility is adequately monitored already by federal, state, local or professional association programs so that the ombudsman would be redundant." 3 *Collier on Bankruptcy, § 333.02* (Matthew Bender 15th Ed. Rev. 2005).

7. James K. Morris ("Morris"), the president and owner of the Debtor, testified that the Debtor is a medical facility in Lake Village, Arkansas, which operates under the name of Delta Diagnostics. [4] Morris established that the Debtor provides only outpatient services, primarily upon physician referral. The [*4] services provided are radiographic studies and the interpretation thereof. Morris further testified that the Debtor does not provide follow-up care, but simply forwards the study reports to the patient's physician. Morris also stated that the Debtor has an established internal complaint process, that no recent complaints have been lodged, and that the Debtor is in compliance with all state and federal regulatory agency requirements. Finally, Morris attested that the Debtor's financial difficulties, which arose as a result of a payment dispute over a PET scanner, have not and should not affect patient care.

8. Application of the above-referenced factors to this case persuades the Court that the appointment of a PCO is not necessary for the protection of patients. *See § 333(a)(1); Fed. R. Bankr. P. 2007.2(a)*. The Debtor has established that it provides only outpatient care, which lessens the need for the appointment of a PCO to insure a continuity of day-to-day care for patients. The Debtor also has implemented a basic internal ombudsman program to handle patient complaints, and is in compliance with regulatory agency requirements. *See In re 7-Hills Radiology, LLC, 350 B.R. 902 (Bankr. D. Nev. 2006)* [*5] (no patient care ombudsman appointed where radiological services were performed only at the request of a referring physician); *see also, e.g., In re Total Woman Healthcare Ctr, 2006 Bankr. LEXIS 3411, 2006 WL 3708164 (Bankr. M.D. Ga. Dec. 14, 2006)* (finding appointment of ombudsman unnecessary where debtor provided outpatient care at her office or performed medical procedures at area hospitals where hospital staff provided additional patient care, where no complaints had been received since bankruptcy filing, and where neither office staff nor patient scheduling had changed due to bankruptcy).

9. Nevertheless, should the Debtor experience any negative trend which indicates the need for the appointment of a PCO in the future, the Court anticipates the filing of an appropriate motion so that the Court might reconsider such an appointment. *See Fed. R. Bankr. P. 2007.2(b)* ("[T]he court, on motion of the United States trustee, or a party in interest, may order the appointment at any time during the case if the court finds that the appointment of an ombudsman has become necessary to protect patients.").

---

1 The following constitutes the findings of fact and conclusions of law of the Court pursuant to *Federal Rules of Bankruptcy Procedure 7052* [*6] and *9014*.

2 According to Collier on Bankruptcy, "[t]his ombudsman is, apparently, to serve as a 'patient advocate' - one who can speak for the consumers of the health care business's services who might have different interests than those of the health care business's creditors - monitoring the quality of patient care, representing the interests of patients and reporting to the bankruptcy court every 60 days on the status of patient care in the debtor's health care business." 3 *Collier on Bankruptcy, § 333.01* (Matthew Bender 15th Ed. Rev. 2005).

Case 11-06207    Doc 7    Filed 10/05/11    Entered 10/05/11 14:20:45    Desc Main
Document    Page 15 of 18

Page 3
2009 Bankr. LEXIS 417, *; Bankr. L. Rep. (CCH) P81,431

3 *Section 333(a)(1)* provides that if the debtor in a case under chapter 11 is a health care business, the court "shall order . . . the appointment of an ombudsman to monitor the quality of patient care and to represent the interests of the patients of the health care business unless the court finds that the appointment of such ombudsman is not necessary for the protection of patients under the specific facts of the case."

4 Although the facility is located in Arkansas, the Debtor is a Mississippi corporation.

IT IS, THEREFORE, ORDERED that the Motion is well taken and that the appointment of a PCO is not necessary for the protection of patients in [*7] the above-styled chapter 11 proceeding.

A separate final judgment consistent with this Memorandum Opinion will be entered by this Court in accordance with *Federal Rule of Bankruptcy Procedure 9021*.

SO ORDERED, this the 23rd day of February, 2009.

/s/ Neil P. Olack

NEIL P. OLACK

U.S. BANKRUPTCY JUDGE



In the Matter of: THE TOTAL WOMAN HEALTHCARE CENTER, P.C., D/B/A JOYCE A. RAWLS, M.D., P.C, Debtor

Chapter 11, Case No. 06-52000 RFH

UNITED STATES BANKRUPTCY COURT FOR THE MIDDLE DISTRICT OF GEORGIA, MACON DIVISION

2006 Bankr. LEXIS 3411; 57 Collier Bankr. Cas. 2d (MB) 603; 47 Bankr. Ct. Dec. 143

December 14, 2006, Decided

COUNSEL: [*1] For Movant: Ms. Elizabeth A. Hardy, Assistant United States Trustee, Macon, Georgia.

For Respondent: Mr. Neal Weinberg, Macon, Georgia.

JUDGES: Robert F. Hershner, Jr., Chief Judge.

OPINION BY: Robert F. Hershner, Jr.

OPINION

BEFORE

ROBERT F. HERSHNER, JR.

CHIEF UNITED STATES BANKRUPTCY JUDGE

*MEMORANDUM OPINION*

The United States Trustee, Movant, filed on November 9, 2006, a Motion Of The United States Trustee For Determination As To Whether Debtor Is A Health Care Business And, If So, For Appointment Of An Ombudsman. The Total Woman Healthcare Center, P.C., d/b/a Joyce A. Rawls, M.D., P.C., Respondent, filed a response on November 30, 2006. Respondent filed a supplemental response on December 4, 2006. Movant's motion came on for a hearing on December 5, 2006. The Court, having considered the evidence presented and the arguments of counsel, now publishes this memorandum opinion.

Respondent filed on October 17, 2006, a petition under Chapter 11 of the Bankruptcy Code. Respondent filed on October 31, 2006, its statement of financial affairs and bankruptcy schedules. The "meeting of creditors" was held on November 21, 2006. [1]

1  *11 U.S.C.A. § 341 (a) (West 2004).*

[*2] Movant, in her motion, contends that Respondent is a "health care business" and asks that the Court order the appointment of a "patient care ombudsman." Respondent opposes Movant's request.

*Section 101(27A) of the Bankruptcy Code provides:*

(27A) The term "health care business"--

(A) means any public or private entity (without regard to whether that entity is organized for profit or not for profit) that is primarily engaged in offering to the general public facilities and services for--

(i) the diagnosis or treatment of injury, deformity, or disease; and

(ii) surgical, drug treatment, psychiatric, or obstetric care; and

(B) includes--
(i) any--

(I) general or specialized hospital;

2006 Bankr. LEXIS 3411, *; 57 Collier Bankr. Cas. 2d (MB) 603;
47 Bankr. Ct. Dec. 143

(II) ancillary ambulatory, emergency, or surgical treatment facility;

(III) hospice;

(IV) home health agency; and

(V) other health care institution that is similar to an entity referred to in subclause (I), (II), (III), or (IV); and

(ii) any long-term care facility; including any--

(I) skilled nursing facility;

(II) intermediate care facility;

(III) assisted living facility;

(IV) home for [*3] the aged;

(V) domiciliary care facility; and

(VI) health care institution that is related to a facility referred to in subclause (I), (II), (III),

(IV), or (V), if that institution is primarily engaged in offering room, board, laundry, or personal assistance with activities of daily living and incidentals to activities of daily living.

*11 U.S.C.A. § 110(27A) (West Supp. 2006).*

Section 333 of the Bankruptcy Code provides in part:

**§ 333. Appointment of patient care ombudsman**

(a)(1) If the debtor in a case under chapter 7, 9, or 11 is a health care business, the court shall order, not later than 30 days after the commencement of the case, the appointment of an ombudsman to monitor the quality of patient care and to represent the interests of the patients of the health care business unless the court finds that the appointment of such ombudsman is not necessary for the protection of patients under the specific facts of the case.

(2)(A) If the court orders the appointment of an ombudsman under paragraph (1), the United States trustee shall appoint 1 disinterested person (other than the United States trustee) [*4] to serve as such ombudsman.

. . .

(b) An ombudsman appointed under subsection (a) shall--

(1) monitor the quality of patient care provided to patients of the debtor, to the extent necessary under the circumstances, including interviewing patients and physicians;

(2) not later than 60 days after the date of appointment, and not less frequently than at 60-day intervals thereafter, report to the court after notice to the parties in interest, at a hearing or in writing, regarding the quality of patient care provided to patients of the debtor; and

(3) if such ombudsman determines that the quality of patient care provided to patients of the debtor is declining significantly or is otherwise being materially compromised, file with the court a motion or a written report, with notice to the parties in interest immediately upon making such determination.

*11 U.S.C.A. § 333 (a)(1), (2)(A), (b) (West Supp. 2006).*

Case 11-06207    Doc 7    Filed 10/05/11    Entered 10/05/11 14:20:45    Desc Main
             Document      Page 18 of 18

Page 3
2006 Bankr. LEXIS 3411, *; 57 Collier Bankr. Cas. 2d (MB) 603;
47 Bankr. Ct. Dec. 143

*Section 333(a)(1)* provides that the appointment of an ombudsman is mandatory *unless* the court finds that the appointment is not necessary for the protection of patients under the specific facts of the case.

The evidence presented [*5] at the hearing shows that Dr. Joyce A. Rawls is the CEO of Respondent. Dr. Rawls is the only physician employed by Respondent. Dr. Rawls is board certified in obstetrics and gynecology.

Dr. Rawls sees patients and performs physical exams, ultra sounds, and biopsies at Respondent's office. Other services provided by Dr. Rawls such as surgery, delivery, and outpatient surgery, are performed at two area hospitals. The hospitals provide nursing services, food, rooms, supplies, and other items and medical services while the patients are in the hospital.

Respondent has the equipment necessary for Dr. Rawls to treat patients at Respondent's office. Respondent's financial distress has not affected patient care. Respondent has the same staff as before the bankruptcy filing. Dr. Rawls has not received any complaints from patients since Respondent filed for bankruptcy relief. Respondent's bankruptcy has not affected Dr. Rawl's scheduling of appointments for patients.

If a patient decides to see another physician, the patient is provided with a copy of her medical records. If a patient has a complaint with Dr. Rawls medical services, the patient can file a complaint with the state medical board. [*6] Dr. Rawls understands that the law would require that Respondent maintain medical records for several years if Respondent went out of business.

The Court has reviewed Respondent's statement of financial affairs and bankruptcy schedules. Most of Respondent's obligations appear to be for taxes. The obligations do not appear to arise from deficient patient care.

The Court, from the evidence presented, is not persuaded that the appointment of an ombudsman is necessary for the protection of patients. Patient care has not been adversely affected by Respondent's bankruptcy filing. Respondent's obligations do not appear to arise from deficient patient care. Dr. Rawls understands her obligation to maintain patient records and to provide copies of the records to patients who decide to see another physician.

The Court, having determined that the appointment of an ombudsman is not necessary under the specific facts of this case, need not decide whether Respondent is a "health care business."

An order in accordance with this memorandum opinion will be entered this date.

DATED this 14th day of December, 2006.

/s/ Robert F. Hershner, Jr.

Chief Judge

United States Bankruptcy Court