**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF SOUTH CAROLINA**

Case No. 11-06207-DD

**ORDER DETERMINING THAT PATIENT CARE OMBUDSMAN UNDER SECTION 333(a)(1) OF THE BANKRUPTCY CODE IS NOT NECESSARY**

The relief set forth on the following page, for a total of 12 pages including this page, is hereby ORDERED.

**FILED BY THE COURT**
**11/08/2011**



David R. Duncan
US Bankruptcy Judge
District of South Carolina

Entered: 11/09/2011

1

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| In re:<br><br>Barnwell County Hospital,<br><br>　　　　　Debtor. | Case No. 11-06207-DD<br>Chapter 9 |

**ORDER DETERMINING THAT PATIENT CARE OMBUDSMAN UNDER SECTION 333(a)(1) OF THE BANKRUPTCY CODE IS NOT NECESSARY**

　　　　This matter is before the Court on the Motion of Barnwell County Hospital (the "Debtor") seeking entry of an Order finding the appointment of a patient care ombudsman pursuant to 11 U.S.C. § 333(a)(1) is not necessary for the protection of patients in this case (the "Motion"). The United States Trustee filed a Response to the Motion ("UST Response"). The Ad Hoc Committee to Save the Barnwell County Hospital also filed a Response stating that it did not believe the appointment of a patient care ombudsman was necessary. No creditor or other party in interest filed a response to the Motion or appeared at the hearing. A representative from the Department of Health and Human Services was present at the hearing to observe, but did not participate in the hearing. The Court, having reviewed and considered the Motion, the UST Response, the testimony and evidence submitted into the record at the hearing on the Motion, and having heard the statements of counsel for the Debtor and the United States Trustee at the hearing; and after due deliberation thereon and good cause appearing therefore, the Bankruptcy Court hereby makes and issues the following Findings of Fact and Conclusions of Law, and Orders:

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

　　　　1.　　The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and

2

1334.  Venue of this case is proper in this Court pursuant to 28 U.S.C. § 1408.

2. Mary Valliant is the Chief Executive Officer ("CEO") of Debtor who supervises and directs the general management and operations of the Debtor and oversees the delivery of patient services.  Ms. Valliant has worked for the Debtor since 2006.  Ms. Valliant graduated in 1968 from Crouse Irving School of Nursing as a Registered Nurse in Syracuse, New York.  She received her BSN from State University of New York and Masters of Science from Syracuse University.  She has worked as a Nurse Manager of Intensive Care and Coronary Care Units and as a Director of Intensive Care, Coronary Care, Obstetrics, Post Partum, Newborn Nursery, Emergency Department and Endoscopy units.  She has previously been employed as the Vice President of Nursing at Community General Hospital, in Syracuse, New York and was responsible for the specialty areas and Women's programs.  She then became a Senior Vice President for new Program Development at Community General.  Upon moving to South Carolina, she became employed by Debtor.  She has worked in Healthcare for 43 years.  Ms. Valliant testified at the hearing, and the Court's findings are based on her uncontradicted testimony.

3. Debtor operates as a hospital located in the city of Barnwell, SC on 811 Reynolds Road, Barnwell, South Carolina.  Debtor is licensed for 53 beds but currently operates 31 beds with both private and semi-private rooms.  The Debtor has 2 general surgical suites and an Endoscopy room with three recovery bays.  The Debtor also operates a Critical Care Unit with 3 ICU beds and 4 step-down beds, a sleep center with 2 beds, Cardiovascular Services, Behavioral Health, and Rehabilitation Services. The hospital's ER is a 7 bed unit.   The property on which the facilities exist as well as the physical facilities are owned by the County.  The Debtor also owns and operates three provider-based Rural Health Clinics in the southwestern rural area of

South Carolina serving the communities of Blackville, Williston, and Wagener. These Rural Health Clinics provide primary health services, basic lab services, emergency care services, after hours coverage and make arrangements for patient hospital specialty care. The Debtor provides general medical and surgical care in inpatient, outpatient, and emergency room service areas. The Debtor has 14 physicians on active medical staff and 13 are Board Certified.

4. The Debtor is reviewed annually by the South Carolina Department of Health and Environmental Control ("DHEC") and Centers for Medicare and Medicaid Services ("CMS"). Ms. Valliant testified that the Debtor is in full compliance with the patient care and safety standards established by CMS and DHEC. Additionally, the Debtor maintains the appropriate and necessary licenses to operate in the State of South Carolina, which license is renewed annually, and granted based on surveys, patient complaints, and the ability to meet emergency preparedness and life safety requirements.

5. The Debtor is subject to unannounced inspections by DHEC for licensing and certification purposes, to monitor compliance with regulations, and to follow up on patient complaints. If the Debtor failed a DHEC inspection or failed to correct an issue of non-compliance with federal or state regulations, the Debtor could lose its license to operate as a hospital. The last DHEC inspection was in May 2011. The Debtor must also follow Occupational Safety and Health Administration ("OSHA") guidelines.

6. The Debtor is also accredited by the Joint Commission Accreditation for Hospitals and Laboratories. Hospitals and Laboratories participating in The Joint Commission's accreditation process receive assistance and support from individual account executives and standards implementation and patient safety experts. Joint Commission certified surveyors provide an evaluation of the hospital's patient care processes and advice on how to improve.

Accreditation means that the Debtor has voluntarily undergone an evaluation to review and improve the key factors that can affect the quality and safety of its patients. Ms. Valliant testified that accreditation by the Joint Commission is considered the gold standard in health care. The Joint Commission commands best practices throughout the organization, and every 24-36 months the Debtor is re-surveyed by the Joint Commission to determine the commitment to and success with best practices in a hospital setting. The last Joint Commission survey was in December 2010.

   7. Debtor's Board of Directors has implemented a Performance Improvement Plan that is revised and updated annually. The Performance Improvement Plan is based on the Joint Commission guidelines. The Debtor has a Performance Improvement Committee which was developed to review and revise and implement quality practices for the hospital. Committee membership is made up of department managers and meets monthly. The team collects data to measure quality of care in the hospital setting. Testimony indicated that some of the areas included in the team review are: hand washing, use of unapproved abbreviations, code blues, appropriate use of restraints, response to critical values, safety rounds, return visits within 72 hours, patient call backs, patient satisfaction surveys, monitoring of equipment and quality, controls, cleaning program for nondisposable equipment, medication errors, medication recalls, incident reporting, and accuracy of chart documentation.

   8. Ms. Valliant testified that due to the small size of the Debtor, every patient file can be reviewed and monitored at every stage of the patient's stay with the Debtor to ensure that all standards of care are being followed. If it appears that a standard or policy has not been followed, the Compliance Officer is notified, and follow up is made with the person responsible for implementing that standard and/or policy with respect to the patient to determine why the

standard and/or policy was not followed. The size of the Debtor and the small number of patients allows for an ongoing review with respect to each patient's care.

9. Policies that ensure quality health services are reviewed and revised at a minimum of every 2 years, and some of the safety policies are reviewed and revised annually. Data that is collected is reported to: the Administrative Team, Performance Improvement Committee, Environment of Care Safety Committee, Medical Staff Executive Committee, and the Board of Directors. Data is also reported to CMS related to Standards of Care for Core Measures. Patient Satisfaction is reported to an external database called HCAPS that uses this data to compare the Debtor to other hospitals. Length of Stays and mortality rates are also reported and used in national comparative databases.

10. The Debtor informs, in writing, each patient at the time of admission of the patient's rights. Each patient receives a document entitled The Patient's Bill of Rights and Lewis Blackman Act from the admissions clerk. Patients are asked to sign an informed consent document at the registration of each visit. They have any questions answered at this time. Each time a patient has an invasive procedure done (for example, an endoscopy, blood transfusion, surgical procedure, biopsy, etc.), a separate informed consent document is signed after the physician has provided the patient an explanation of the testing or procedure as well as the risks and benefits of the procedure.

11. Ms. Valliant testified that the Debtor takes patient complaints and/or concerns very seriously. All staff members know the policy regarding patient complaints and can direct patients or customers as needed to ensure that patient concerns are addressed. All staff members receive annual training on the policy regarding patient complaints. Normally, the complaint goes to the department manager where the concern originates. The Compliance Officer for the Debtor

is also notified. A complaint form is filled out and an investigation begins to determine exactly what has occurred. If the concern or complaint is related to HIPPA, this is referred to the HIPPA officer for investigation. The Compliance Officer discusses any complaints with Ms. Valliant. The Debtor utilizes Global Compliance, a service vendor which provides a 24 hour a day hotline that employees or customers may anonymously call. These calls are screened by trained compliance officers and forwarded to the compliance officer's confidential voice mail or email. At the close of an investigation, all efforts to resolve issues with customer are taken. If the concern requires bill modification, it has to be authorized in writing by the CEO. If a physician or nurse is involved, they are made aware of the complaint and required to respond in writing. Complaints are reported to the Medical staff and to the Board in a quarterly report by the Compliance Officer. All complaints are filed and maintained for 10 years in a locked file in the Compliance Officer's space.

      12.     The average length of an inpatient stay for patients is 2.5 days. The staffing ratio for each patient is based upon the patient's needs, and staffing assignments are made daily according to the specific acuity level of the patient; however, there are always at least 2 nurses on duty.

      13.     The Debtor hospital is a small hospital and because of this, Ms. Valliant is able to speak to the patients and listen to and individually address their concerns. Additionally, Ms. Valliant is informed of all patient care complaints.

      14.     Ms. Valliant testified that the patient care has not been affected by the filing of the bankruptcy and that the patients are treated in the exact same manner as if a bankruptcy had not been filed.

      15.     On October 5, 2011, the Debtor filed a petition seeking relief under chapter 9 of

7

the United States Bankruptcy Code ("Bankruptcy Code").  On the same day, the Debtor filed the Motion seeking an order that the appointment of a patient care ombudsman under 11 U.S.C. § 333(a)(1) was not necessary for the protection of patients under the specific facts of this case.

16. If the debtor in a case under chapter 9 is a health care business, the appointment of a patient care ombudsman is mandated by § 333(a)(1), not later than 30 days after commencement of the case, to monitor the quality of patient care and to represent the interests of the debtor's patients "unless the court finds that appointment of such ombudsman is not necessary for the protection of patients under the specific facts of the case."  An ombudsman appointed under § 333(a)(1) monitors the quality of patient care provided to patients of the debtor and reports to the court regarding the quality of patient care provided to patients of the debtor. 11 U.S.C. § 333(b). It is clear the Debtor is a "health care business" under § 107(27)(A), as it is a public agency engaged in offering health care services through its hospital facilities to the residents of the County, and therefore § 333(a)(1) is applicable to the Debtor.

17. In determining whether a patient care ombudsman is necessary under the specific facts of a case, courts have examined the following nine non-exclusive factors: 1) the cause of the bankruptcy; 2) the presence and role of licensing or supervising entities; 3) debtor's past history of patient care;  4) the ability of the patients to protect their rights; 5) level of dependency of the patients on the facility; 6) likelihood of tension between the interests of the patients and the debtor;  7) potential injury to the patients if the debtor drastically reduced its level of patient care; 8) presence and sufficiency of internal safeguards to ensure appropriate level of care; and 9) impact of the cost of an ombudsman on the likelihood of a successful reorganization. *In re Valley Health Sys,* 381 B.R. 756, 761 (Bankr. C.D. Cal. 2008) (citing *In re Alternate Family Care*, 377 B.R. 754, 758 (Bankr. S.D. Fla. 2007)).  "Other factors to be considered by the court

8

include: (1) the high quality of the debtor's existing patient care; (2) the debtor's financial ability to maintain high quality patient care; (3) the existence of an internal ombudsman program to protect the rights of patients, and/or (4) the level of monitoring and oversight by federal, state, local, or professional association programs which renders the services of an ombudsman redundant." *Valley Health,* 381 B.R. at 761 (citing 3 *Collier on Bankruptcy* ¶ 333.02, at 333-4 (Alan N. Resnick & Henry J. Sommer eds., 15th ed. 2007)).

18.     Since the enactment of § 333, bankruptcy courts have sometimes exercised their discretion and held the appointment of an ombudsman unnecessary. *See In re RAD/ONE, P.A.*, 2009 Bankr. LEXIS 417 (Bankr. N.D. Miss. Feb. 24, 2009) (court declined to appoint patient care ombudsman where debtor had an existing internal ombudsman program and was compliant with regulatory agency requirements); *In re Valley Health Sys.*, 381 B.R. 756 (Bankr. C.D. Cal. 2008) (court declined to appoint patient care ombudsman where health care district had no history of patient care problems and adequate internal monitoring systems); *In re Saber, M.D.,* 369 B.R. 631 (Bankr. D. Colo. 2007) (court declined to appoint patient care ombudsman where debtor was a single physician entity, with 20 years of experience, in good standing with a positive cash flow who filed bankruptcy for reasons unrelated to patient care); *In re Medical Assocs. of Pinellas,* 360 B.R. 356, 361 (Bankr. M.D. Fla. 2007) (court declined to appoint patient care ombudsman where debtor had ceased operation); *In re Total Woman Healthcare Center, P.C.,* 2006 Bankr. LEXIS 3411 (Bankr. M.D. Ga. Dec. 14, 2006) (court declined to appoint patient care ombudsman where patient care had not been affected by bankruptcy and debtor's obligations not related to patient care).

19.     Considering the factors under the specific facts and circumstances in this case, the Court finds the appointment of a patient care ombudsman pursuant to § 333(a)(1) is unnecessary

at this time.

20. Factor 1: Cause of Bankruptcy:  Debtor is seeking relief under chapter 9 due to a shortfall of revenue to pay its debts, not because there are any allegations of deficient patient care.

21. Factor 2: Presence of Licensing/Supervising Entities**:** The Debtor is subject to substantial monitoring by a variety of federal and state regulatory agencies, as described above. Additionally, Debtor is accredited by the Joint Commission which includes additional monitoring.  Finally, Debtor appears to be in compliance with all applicable federal and state regulations.

22. Factors 3 and 8: Debtor's Past History of Patient Care/Internal Safeguards:   The Debtor has served the residents of the County for over fifty years.  The Debtor has adopted internal procedures to ensure a high level of patient care and to expeditiously resolve complaints that may arise concerning patient care.  Furthermore, there is no evidence of action taken by any federal or state regulatory authority against the Debtor due to patient care issues.  There is no evidence of an excessive or unusual number of complaints.

23. Factors 4 and 6:  Ability of the Patients to Protect Their Rights; The Likelihood of Tension Between the Interests of the Patients and the Debtor:  The Debtor has implemented internal quality controls and procedures for monitoring patient care at the hospital.  There are procedures in place for handling and resolving any complaints made by patients.  The patients are informed, in writing, of their rights upon being admitted to the hospital.  Additionally, due to the small setting of the Debtor, the Debtor's employees are able to closely monitor the patients and listen to the patient's concerns.

24. Factor 5: Level of Dependency of Patients on the Facility.  The Debtor provides

general medical and surgical care in inpatient, outpatient, and emergency room service areas at the hospital. The patients under the Debtor's care are dependent on the Debtor for their health, safety, and welfare when at the hospital; however, the average length of inpatient stay is only 2.5 days.

25. Factor 7: Potential Injury to Patients if the Debtor Drastically Reduced its Level of Patient Care. The Debtor is meeting and/or exceeding national staffing ratios. The Debtor is working to ensure that patient care is provided in an appropriate and planned manner consistent with patient's rights and needs using the Joint Commission's standards.

26. Factor 9: Impact of the Cost of an Ombudsman on the Likelihood of a Successful Reorganization. For the reasons discussed above, it appears that a patient ombudsman is not currently necessary in this case to protect the interests of the patients and would unnecessarily duplicate services already being provided to the Debtor. Given the level of internal controls, oversight by federal and state agencies, oversight by the Joint Commission, and the current management of the Debtor, the services of a patient care ombudsman would be redundant at this point in time and, given the Debtor's financial problems, the requirement of an ombudsman would be adverse to efforts at rehabilitation.

27. Accordingly, weighing the above factors under the specific facts and circumstances in this case, the Court finds that the appointment of a patient care ombudsman pursuant to § 333(a)(1) is not necessary at this time.

**IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED THAT:**

1. The Debtor's Motion is granted, as the appointment of a patient care ombudsman pursuant to 11 U.S.C. § 333(a)(1) is not necessary at this time for the protection of patients under

11

the specific facts of this case.

**AND IT IS SO ORDERED.**